# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy No. 09 B 04820 |
| | Chapter 7 |
| STUART M. HANSON, d/b/a | Judge John H. Squires |
| HANSON & WHITE, LLC, | |
| | Adversary No. 09 A 00447 |
| Debtor. | |
| | |
| STUART M. HANSON, | |
| Defendant-Appellant, | |
| | No. 10 C 7634 |
| v. | |
| | The Honorable William J. Hibbler |
| 6050 GRANT, LLC, | |
| Plaintiff-Appellee. | |

## MEMORANDUM OPINION AND ORDER

Defendant-Appellant Stuart Hanson filed for Chapter 7 bankruptcy in February 2009. In June 2009, Plaintiff-Appellee 6050 Grant, LLC, filed a complaint to determine whether the debt Hanson owed the company was dischargeable. After an evidentiary hearing, the Bankruptcy Court ruled in 6050 Grant's favor, holding that the debt, which the court valued at $93,461.29, was not dischargeable. Hanson now appeals that decision. This court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1). For the following reasons, the Court affirms the decision of the Bankruptcy Court.

## I. Standard of review

The Court reviews the Bankruptcy Court's factual findings for clear error, but reviews conclusions of law *de novo*. *In re Berman*, 629 F.3d 761, 766 (7th Cir. 2011); *see also* Fed. R. Bankr. P. 8013. The Court will reverse the Bankruptcy Court's findings of fact when "although

1

there is evidence to support the findings, [the Court] is left with the definite and firm conviction that mistake has been committed." *In the Matter of Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995) (internal quotations and brackets omitted).

## II. Facts

Most of the facts in this case are undisputed. In the spring of 2008, Mark O'Gorman decided to work with Stuart Hanson, and his company, Hanson & White, LLC ("H&W"), to design and build a custom home. Hanson identified a property where they could complete the project on 6050 South Grant in Burr Ridge, Illinois. Hanson then created 6050 Grant LLC as a legal entity for the purpose of purchasing and holding title to the property. On April 16, 2008, O'Gorman wire transferred $275,000 to Hanson for the project. From that money, Hanson used $150,000 to pay the earnest money for the purchase of the property, $75,000 as a non-refundable deposit on Hanson's builder's fee, and $34,750 as an expense advance. He took the remaining $15,250 as a one percent finder's fee for locating the property, which 6050 Grant purchased for $1,525,000. Hanson deposited all of the money in H&W's operating account, which at the time contained slightly more than $5,000. He never segregated the money in his account that was intended for the 6050 Grant project. Instead, he commingled the funds with the other funds in H&W's operating account.

6050 Grant purchased the house on May 2, 2008. O'Gorman wire transferred $1,397,500 for the purchase. However, 6050 Grant ultimately paid only $1,375,694.13 at closing, leaving an excess of $21,805.87. Hanson deducted $15,250 from the excess as a finder's fee, despite the fact that he had already taken his finder's fee from the first deposit, and credited the remaining $6,555.87 to O'Gorman's balance.

2

On the same day, on behalf of 6050 Grant, Hanson entered into a contract with CaprioPrisby Architectural Design, P.C. for the design work on the new home. The individual primarily responsible for the project at CaprioPrisby was James Prisby. Shortly thereafter, O'Gorman took over Hanson's role as the sole member of 6050 Grant.

On June 16, 2008, 6050 Grant entered into a construction agreement with H&W. The agreement stated that 6050 Grant would pay H&W a builder's fee equal to 15% of the total costs of designing and building the house. The agreement recognized that 6050 Grant had already paid a $75,000 deposit on the fee. The agreement also contained the following provision regarding disbursements made to Hanson during the design phase:

> Throughout design phase [sic], [6050 Grant] will pay expenses incurred by [H&W], as incurred and to be presented on a monthly basis. These costs will be payable directly to [H&W] to cover all costs of the design phase, which will be complete at the issuance of the Building Permit by the Village of Burr Ridge.

The agreement also noted that 6050 Grant had already provided an expense advance of $50,000, although $15,250 of that advance had been applied to Hanson's finder's fee.

On or about July 3, 2008, Hanson sent a document to O'Gorman entitled "Customer Statement & Additional Deposit Request" (the "July Statement"). The July Statement provided a table indicating what costs had been deducted from O'Gorman's original $275,000 transfer and the subsequent credit of $6,555.87 Hanson applied from the excess funds after the property purchase. Included on the statement were an "Architecture down payment" of $4,225.00 from May 13 and "Architecture progress payments" of $17,495.42 from June 30, 2008. The statement indicated that the remaining credit on the account was $5,985.45 and requested an additional $160,000 deposit for expenses. O'Gorman made that deposit on July 10, 2008.

3

When the July Statement was issued, Hanson had received two bills from CaprioPrisby. He received a bill for a retainer of $4,225, dated May 19, 2008, which he had paid. He also received a bill for services of $8,465.29, dated June 17, 2008, which he had not yet paid. This is where the dispute between the parties begins. Hanson claims that the $17,495.42 line item on the July Statement for "Architecture progress payments" was an estimate of the costs H&W had already "incurred" from CaprioPrisby despite the fact that it had only received a bill of $8,465.29. He claims that this was understood by all parties at the time, and that he made his estimate on the basis of estimates he received from CaprioPrisby. The next bill he received from CaprioPrisby was for $8,506.01, and was dated July 10, 2008. Hanson paid both bills, amounting to $16,971.30, on July 14. Thus, if Hanson was in fact estimating the payment he would make on those two bills in the July Statement, he overestimated by $524.12.

6050 Grant disputes Hanson's claims, however. O'Gorman claims that Hanson never indicated that the amounts on the July Statements were estimates, and that he had the impression that they represented amounts H&W had already been billed for and paid. He claims that he made his additional $160,000 on the basis of that belief. He also claims that if he had known that Hanson had not only estimated architectural payments that he had not yet paid, but that he had overestimated them, and that Hanson had twice deducted the finder's fee despite the fact that he had only disclosed one deduction on the July Statement, he would not have made the additional deposit and would have terminated the contract with H&W at that point.

Instead, the relationship continued. On September 30, 2008, Hanson emailed O'Gorman, stating, among other things, "I'll touch base with you later in the week so we can set up a progress payment." When O'Gorman responded by questioning whether the cost of the project

4

had already exceeded the amounts 6050 Grant had deposited, Hanson responded by apologizing because "I realized that we had not accounted for your $160,000 payment in July properly."

H&W then sent 6050 Grant a statement on October 21, 2008. The statement purported to set forth the costs deducted from 6050 Grant's account from July 1, 2008 to October 21, 2008. The statement included architecture-related costs of $16,971.30 on July 14, $8,490.39 on September 12, and three separate adjustments on October 21 of $47,365.00, $13,849.00, and $4,850. Thus, in total, the statement indicated deductions of $91,525.69 for architectural fees during the covered period. At the time, Hanson had received, at most, three more invoices from CaprioPrisby. The first, dated August 11, was for $8,490.39. The second, dated September 23, was for $21,241.13. The third, dated October 14, 2008, was for $62,965.00. Together, the bills totaled $92,696.52. However, of the three bills issued, H&W had only paid the first one at the time of the October Statement. In fact, that bill, for $8,490.30, was the last bill from CaprioPrisby H&W would ever pay. Thus, all told, H&W paid $29,686.69 to CaprioPrisby.

Once again, Hanson and 6050 Grant dispute whether the architectural costs shown on the October statement were intended to be estimates. However, this time O'Gorman testified that he actually confronted Hanson about the architectural expenses and asked him whether he had already paid the amounts listed. O'Gorman claims that Hanson lied and told him that he had paid them.

The October Statement also listed a $29,093.28 charge for construction management fees. O'Gorman questioned Hanson about that amount as well, because he doubted that Hanson's fees, which were to be calculated as 15% of the construction costs to date, could have already exceeded the $75,000 deposit O'Gorman had already put down. Hanson responded by revising the October Statement by omitting the charge.

5

Finally, the October Statement contained an $11,750 charge for a permit fee that Hanson had not yet paid because he had not obtained the permit.

Originally, the October Statement indicated that 6050 Grant had a negative balance of $6,492.64 and requested an additional deposit of $100,000 to cover future costs. After the revision, the statement indicated a credit on the account for $22,600.64 and requested an additional deposit of $70,000. At the time he issued the statement, Hanson had approximately $6,000 in his operating account.

At the end of October, O'Gorman decided that he could no longer trust Hanson and sent Hanson a letter terminating the contract. Hanson informed O'Gorman that there were unpaid project invoices that O'Gorman would have to resolve. These included a mechanic's lien that CaprioPrisby was asserting against the property for $60,348.13. CaprioPrisby had reduced its October 14th bill to Hanson by $24,258, but had issued an additional $400 invoice on November 14. Thus, CaprioPrisby billed a total $90,034.82 for the project. H&W had only paid $29,686.69, leaving the outstanding balance CaprioPrisby now claimed. Ultimately, 6050 Grant settled with CaprioPrisby for $55,000.

It is also undisputed that Hanson used the remainder of the money deposited by O'Gorman for other projects besides O'Gorman's home.

The Bankruptcy Court discredited much of Hanson's testimony, finding him to lack credibility when compared to Prisby and O'Gorman. The Court ultimately determined that Hanson had engaged in a scheme to mislead O'Gorman into transferring more money than necessary to Hanson because Hanson's business was struggling and his operating account was running low. Thus, it found Hanson's debt to 6050 Grant to be nondischargeable. In order to calculate the amount Hanson owed to 6050 Grant, the court first added the amounts that Hanson

claimed to have deducted from 6050 Grant's account for architectural payments ($113,246.11) to the amount 6050 Grant paid to resolve CaprioPrisby's lien ($55,000), and determined that 6050 Grant ultimately lost $168,356.11 on architectural expenses. The court then subtracted the amount that CaprioPrisby actually charged for its services ($90,034.82), and determined that 6050 Grant had overpaid by $78,211.29. Finally, the court added on the $15,250 that Hanson had over-charged when he charged for the finder's fee a second time. The court concluded that Hanson owed 6050 Grant a nondischargeable debt of $93,461.29.

### III. Analysis

The Bankruptcy Court held that Hanson's debt was not dischargeable under 11 U.S.C. § 523(a)(2)(A). Under that section, debt that is obtained by "false pretenses, a false representation, or actual fraud" cannot be discharged. *Id.* The creditor must prove that the debt was obtained through such means by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 661, 112 L. Ed. 2d 755 (1991). Furthermore, the Court construes exceptions to discharge "strictly against a creditor and liberally in favor of the debtor." *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000). Courts use a single test to determine whether a debtor used false pretenses or a false representation to obtain money, as the Bankruptcy Court found here. The creditor must establish that: (1) the debtor made a false representation or omission; (2) the debtor (a) either knew it was false or made it with reckless disregard for the truth, and (b) made it with the intent to deceive; and (3) the creditor justifiably relied on the representation or omission. *Ojeda v. Goldberg*, 599 F.3d 712 (7th Cir. 2010).

Here, the Bankruptcy Court found Hanson's testimony not to be credible and discounted his claims that the amounts shown on the statements were merely estimates, that this was

understood between the parties, and that the errors on the statements were unintentional mistakes. The court provided a number of reasons for so finding.

First of all, James Prisby testified that he did not give verbal estimates for his services, and that even if he did, he would not have given them to the exact penny as reflected on Hanson's statements to 6050 Grant. While Prisby did allow for the possibility that someone else at the firm could have given such an estimate, the exact nature of Hanson's purported estimates still made the court question his credibility. In addition, Hanson's actions in October added further support for the finding that his statements were not intended to be estimates. Hanson included a number of deductions on the October Statement that were not only exact, but did not match the bills he actually had received. Moreover, he deducted the correct amount for the July architectural services, $16,971.30. If the $17,495.42 charge on the July Statement was actually an estimate of the total from the first two architectural bills, the October Statement should have included a $524.12 credit, not a $16,971.30 charge. Thus, Hanson's own October Statement contradicts his claims that the charge on the July Statement represented an estimate of the first two bills for services from CaprioPrisby. Finally, the court found O'Gorman credible when he testified that Hanson affirmatively stated that the architectural bills reflected on the October Statement had already been paid. Given Hanson's lack of credibility on this point, the court found that the architectural costs on the July Statement were not estimates or mistakes, but intentional misrepresentations.

The Bankruptcy Court also discredited Hanson's claim that the double-counted finder's fee was an honest error. Not only did Hanson deduct the finder's fee twice, but he did not even note the second deduction on the July Statement. The Court noted that Hanson's July and

8

October Statements contained a series of similar mistakes, all of which benefited Hanson, and thus found Hanson's self-serving claims of mistake to be unbelievable.

In addition to the repeated discrepancies and falsehoods in Hanson's actions and later testimony, the court also relied on his demeanor in court and evidence of his financial situation in assessing his credibility. The court noted that while Hanson repeatedly made false representations on his statements to 6050 Grant that induced 6050 Grant to provide him with larger advances than necessary, he had very little money in his business operating account. He commingled the funds from 6050 Grant with his other operating funds and frequently spent the money on things besides the 6050 Grant project.

Finally, the Court found that 6050 Grant justifiably relied on Hanson's misrepresentations when it transferred him the additional $160,000 in July. The Court found O'Gorman credible when he testified that he would have cancelled the contract in July if he had known that Hanson was lying.

Hanson takes great issue with the Court's reliance on any actions he took after he issued the July Statement. He cites *Rae v. Scarpello*, 272 B.R. 691, 701 (Bankr. N.D. Ill. 2002), for the proposition that "[e]nsuing conduct contrary to a former representation by a debtor does not establish that the original representation was false." He argues that if the July Statement is viewed alone, it contains only one mistake in the form of the double-counted finder's fee, and one slight over-estimate in the form of the architectural fees.

Hanson is correct that § 523(a) provides consequences for obtaining debt by false pretenses, not for breaking promises after the fact. In other words, if Hanson intended to use 6050 Grant's money as promised from the beginning and then, due to unforeseen economic circumstances, broke his promise and used the money elsewhere in order to keep his business

afloat, then he may be guilty of breach of contract, but not of anything resembling fraud. But the Bankruptcy Court did not rely on Hanson's broken promises in later months to find that he intended to lie in July. The court did not find Hanson unreliable simply because he did not use the money 6050 Grant him as he claimed he would. Instead, the court relied on Hanson's repeated misrepresentations in later months. The court found Hanson lacked credibility when he claimed that he made honest mistakes in July because he made the same sort of mistakes again in October and every mistake fell in his favor, rather than in favor of 6050 Grant. The court also doubted that Hanson was telling the truth when he promised to use the money towards 6050 Grant because he already knew that his business had very little in its operating account and that he would be forced to use the money on other costs.

Hanson also argues that it was clear error for the Bankruptcy Court to hold that he was lying in July because he showed his true intentions when he substantially performed on his contract with 6050 Grant. Hanson points to the fact that he did use much of the money towards the 6050 Grant project, including over $29,000 towards architectural fees. However, the fact that Hanson used some of the money appropriately does not mean he was not lying to 6050 Grant in order to obtain more money to use inappropriately. Indeed, Hanson may very well have been using some of the money towards the 6050 Grant project as part of his fraudulent scheme. He may have thought that by using just enough of the money towards the project, he could string 6050 Grant along and continue to obtain large advances that he could use on his other debts. In fact, Hanson may have even intended to eventually catch up on his debts and successfully complete the 6050 Grant project without causing any permanent harm to 6050 Grant, but that does not mean that he did not intend to deceive 6050 Grant into giving him more money up front that he could use elsewhere. While the court was required to construe the language of § 523

narrowly in Hanson's favor, the court did not have to construe the facts in his favor. If Hanson lacked credibility, he was not entitled to inferences in his favor.

In short, the Court cannot find clear error in the Bankruptcy Court's finding that Hanson intentionally deceived 6050 Grant through false pretenses or false representations. It was proper for the court to rely on Hanson's demeanor in court, later misrepresentations, and his financial situation at the time, in finding that Hanson was less credible than the other witnesses when their testimony conflicted. It was proper for the court to doubt Hanson when he made so many false statements to 6050 Grant and they always seemed to serve him well. It was proper for the court to find justifiable reliance given that Hanson, even if he did not intend to deceive 6050 Grant, clearly intended for the company to rely on his July Statement and make the $160,000 transfer. It was also reasonable for the court to believe O'Gorman that he would have cancelled the contract earlier if he had reason not to trust Hanson because he did in fact cancel the contract immediately once he had reason to doubt him. Hanson did provide some evidence that he intended to fulfill his obligations to 6050 Grant all along, but not enough to overturn the Bankruptcy Court's decision, especially given the deferential standard of review the Court applies on appeal.

Hanson also disputes the Bankruptcy Court's calculations regarding the amount of debt. However, Hanson's arguments on this point lack any merit. He first argues that the debt should be reduced by the $29,686.69 that Hanson actually paid CaprioPrisby. But this misses the logic behind the Court's calculations. The Court reasoned that, as a result of Hanson's misrepresentations, 6050 Grant paid $168,356.11 in architectural expenses, either to Hanson or directly to CaprioPrisby. However, 6050 Grant only received $90,034.82 worth of services from CaprioPrisby. Thus, Hanson essentially pocketed the difference between these amounts. In

11

reality, Hanson actually pocketed more than the $78,321.29 difference because he was benefited by the fact that CaprioPrisby settled its lien with 6050 Grant for less than what it was actually owed. Hanson actually deducted a total of $113,246.11 from 6050 Grant's account for architectural expenses, while paying only $29,686.69 to CaprioPrisby, leaving a surplus of $83,559.42 in Hanson's account that he did not properly account for on the statements he made in July and October. Thus, Hanson will not be heard to complain that as a result of CaprioPrisby's compromise with 6050 Grant the Bankruptcy Court only held him responsible for $78,321.29 in architectural charges.

Hanson next argues that the $15,250 finder's fee should not be included in his debt because he double-counted the amount only as a result of an accounting error. However, the Bankruptcy Court did not find Hanson's explanation credible, and found that Hanson made the accounting error with an intent to deceive 6050 Grant. As explained above, the Court affirms the Bankruptcy Court's findings. Hanson's second argument regarding the finder's fee seems to be that for some reason this error was "inconsequential" because 6050 Grant did actually owe H&W $15,250 for a finder's fee in July 2008. This argument makes no sense. The July 2008 Statement explicitly accounted for the $15,250 finder's fee, but then failed to credit 6050 Grant for the full amount of money left over from the closing because Hanson subtracted $15,250 from that amount as well without noting it on the July Statement. Thus, it is undisputed that the balance on 6050 Grant's account was $15,250 less than it should have been on the July 2008 Statement. Because the Bankruptcy Court found that this deceptively low balance caused 6050 Grant to transfer additional money to Hanson, it was proper for the court to include the $15,250 in the final calculations.

In sum, the Bankruptcy Court found that Hanson, through false pretenses, caused 6050 Grant to transfer $160,000 to him that it would not have otherwise transferred. Hanson apparently used some of that money to legitimately advance the 6050 Grant project. However, most of the money he claimed to have used towards architectural fees was not used on the project at all. Moreover, some of the money was advanced to make up for the excess money from the closing that Hanson had not actually spent when he issued the July Statement. Thus, 6050 Grant lost this money and saw nothing in return. The Bankruptcy Court's calculations thus accurately reflect the debt owed to 6050 Grant.

## *CONCLUSION*

For the foregoing reasons, the Court affirms the decision of the Bankruptcy Court.

IT IS SO ORDERED.

7/18/11
Dated

Hon. William J. Hibbler
United States District Court